

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-11-00273-CR

| | | |
|---|---|---|
| William Gilmore | § | From the 211th District Court |
| | § | of Denton County (F-2009-2086-C) |
| v. | § | December 21, 2012 |
| | § | Opinion by Justice Gardner |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Anne Gardner



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00273-CR

WILLIAM GILMORE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                       STATE

----------

## FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

## I. Introduction

A jury convicted Appellant William Gilmore of aggravated assault with a deadly weapon and assessed his punishment at twenty years in prison.[1] On appeal, Appellant challenges the admission of two witnesses' identifications, the sufficiency of the evidence, and the trial court's jury instructions. We affirm.

---

[1]*See* Tex. Penal Code Ann. § 22.02(a)(2) (West 2011).

## II. Procedural and Factual Background

The State charged Appellant with aggravated assault with a deadly weapon, alleging that he had intentionally, knowingly, or recklessly caused bodily injury to Kimberly Boggs by shooting her with a deadly weapon.

At trial, Kimberly testified that at approximately 11:00 a.m. on June 22, 2009, she and her husband Tracy walked to their neighborhood park with their two children, six-year-old G.B. and two-month-old S.B. Kimberly pushed S.B. in a stroller, and Tracy walked next to G.B., who was riding in an electric toy "Jeep." When they arrived, the only other person at the park was a man with a black backpack who was sitting on a park bench and reading a book. Kimberly made eye contact with the thin, gray-haired man, whom she identified in court as Appellant.

Kimberly and Tracy sat down at a picnic table with their daughter, and G.B. rode his Jeep around the park. After a few minutes, the battery in G.B.'s Jeep went dead, and Appellant commented, "I think he's stuck." Tracy left the park and walked home to retrieve another battery, and Kimberly and the two children remained at the park.[2]

---

[2]Tracy testified and corroborated much of Kimberly's testimony. Tracy explained that the man he saw at the park—whom he later identified in a photo lineup and in court as Appellant—was sitting on a bench, reading a book, and had a black backpack. Tracy looked directly at Appellant when Appellant commented that G.B.'s Jeep was broken or stuck. Tracy agreed with Appellant's counsel that in Tracy's written statement to the police, he described the man as being in his mid- to late-forties with a pony tail and a medium-sized nose.

After a few minutes, Kimberly held S.B. on her knee. Around that same time, she saw Appellant walk toward the only car in the parking lot, leaving his backpack near the bench. Appellant then walked back toward the park, came within two to five feet of Kimberly, and began questioning her about her son's Jeep. As they talked, Kimberly got a good look at Appellant's face; she noticed he had "really blue" eyes, gray scraggly hair, and was approximately sixty years old. Then, without warning or provocation, Appellant shot Kimberly in the right side of her face, just below her temple. Kimberly, who testified that she did not see the gun and did not remember seeing Appellant after he shot her, picked up her daughter, who had fallen on the ground, placed her in the stroller, and ran to a nearby home to get help. Amy Storey answered the door, called 911, and followed Kimberly back to the park to attend to the children, who were scared but physically unharmed. Officers with the Corinth Police Department arrived, and Kimberly described Appellant to them before being airlifted to Parkland Hospital.[3]

When officers arrived at the scene at approximately 11:45 a.m., the only vehicle in the parking lot was an SUV, and the owner Evelia Lopez and her family were playing in the park, unaware of the shooting. Lopez told the officers that she had driven past the parking lot a few minutes earlier on her way to pick up her nephew at school at 11:30 a.m. and that she had noticed a green four-door

---

[3]Kimberly remained in the hospital for two days. Her jaw was broken in two places, and she lost the uvula in the back of her throat. She lost hearing in her right ear, and she suffered "a lot of emotional pain."

car with tinted windows in the lot.  When she pulled into the same lot immediately after picking up her nephew, the car was gone.

Kim Hollar testified that she was an administrative assistant with the Corinth Police Department and that at approximately 2:45 p.m. the day of the offense, a man walked into the police department's lobby and stated that he had some property to turn in.  When Hollar asked for additional information about the property, the man stated it was "complicated."  Hollar then retrieved a supervisor.  Hollar identified Appellant in court as the man who came to the police department that day.

Lieutenant Lance Stacy testified that on the afternoon of the offense, Hollar came to his office and told him that there was a gentleman in the lobby who needed to speak with an officer.  Lieutenant Stacy identified Appellant in court as the man in the lobby and testified that Appellant said, "Come out here.  It's out here."  According to Lieutenant Stacy, Appellant then said something to the effect of "I know I'm not allowed to have it here in Texas.  It's loaded."  Appellant led Lieutenant Stacy outside to a small green, four-door Ford Focus, and stated, "[I]t's back here," and "I know I'm not allowed to have it loaded in Texas and it's not registered here . . . ."  At the car, Appellant invited Lieutenant Stacy to retrieve a black backpack from the back seat.  At Appellant's direction, Lieutenant Stacy unzipped the backpack and pulled out a .44 Magnum revolver.  After ejecting the six live rounds from the weapon, Lieutenant Stacy asked Appellant about the significance of the weapon, to which Appellant responded,

4

"Oh, she didn't tell you? . . . It's about the incident in the park."[4] Lieutenant Stacy testified that at some point—either after saying he had a loaded gun or after referring to the "incident in the park"—Appellant stated, "'I'm pleading not guilty.'" As soon as Lieutenant Stacy realized that Appellant was a possible suspect in the park shooting, he notified officers at the scene. Lieutenant Stacy then asked Appellant if he had any other weapons, and Appellant turned around and put his hands on his car. Lieutenant Stacy conducted a pat down, and after finding no other weapons, he led Appellant back into the police station, after allowing him to retrieve a book from the car and some contact lens solution.[5] As they waited for other officers to arrive, Appellant produced three microcassette tapes and, according to Lieutenant Stacy, stated, "[O]nce you listen to these, then you'll know or then you'll understand, something to that effect."[6]

---

[4]Lieutenant Stacy testified that the gun was fully loaded at that time and that it was cool to the touch. He later testified that he did not believe this was the weapon used in the offense because it was too powerful and would have injured Kimberly more extensively.

[5]When officers later searched Appellant's car, they found two semiautomatic pistols in the trunk.

[6]The record indicates that approximately one month before the offense, Appellant made taped statements lasting three hours and forty-five minutes. The State played an edited version of the tapes for the jury. At trial, Appellant testified that he had two purposes for making the tapes. One was to report "numerous crimes both committed against [him] but more importantly against the general public, not just locally but state-wide," and the other was "to entice the police into . . . making a hasty arrest." Appellant agreed with the prosecutor that during the first hour and forty-five minutes of the tape he talked about the speeding ticket he got in a school zone and the discoveries and resulting problems he encountered with the justice system. He agreed that for the next

5

At approximately 5:00 that afternoon, officials asked Tracy to come to the police station to look at a photographic lineup. Tracy testified that Captain Gregg Wilkerson presented him with a six-picture photo spread, that he chose Appellant's picture, and that he told Captain Wilkerson he was "70–30 percent sure," meaning seventy percent sure. Captain Wilkerson testified for the defense that Tracy said he was "about 30 percent" sure.

The afternoon of the shooting, a police officer went to Kimberly's hospital room, showed her a one-sheet photo lineup containing six pictures, and asked her if she recognized anyone. Kimberly, who was still under the influence of her medications, looked at the photographs for approximately ten minutes. She narrowed her choices down to two similarly-looking men, one of whom was Appellant. When the officer asked her to make her selection, however, she identified the other individual as the shooter.

That evening, Kimberly and Tracy watched the nightly newscast, which aired a story about the shooting. Kimberly testified that when the newscast displayed a picture of Appellant, she stated, "[T]hat's him." She further testified that, regardless of seeing a photograph of Appellant on television, seeing Appellant in the courtroom left her no doubt that he was the shooter. Tracy testified that even if he had not seen Appellant's picture in the photo lineup or

hour he talked about Mary Shelley's novel *Frankenstein*. He also agreed that in the final segment of the tapes, he talked about wanting to get caught, wanting to take a "perp walk," and about how easy it was to get away with stranger-on-stranger murder.

Appellant's picture on the newscast, he still would have been able to recognize Appellant as the man who was in the park.

Margaret Wagner testified that she worked at a warehouse near the park and that at 11:39 a.m. on the day of the offense, she looked at her clock and decided to take her lunch break. As she walked outside, she heard what sounded like a gunshot. She saw a man walking slowly through the park toward the park's parking lot, carrying what looked like black trash bags wadded up in front of him at waist level. She described the man as approximately five foot eight in height, thin, and wearing pants, a shirt, and a baseball cap. Because the man appeared to be picking up trash, Wagner did not investigate the situation any further.[7] Wagner testified that she could not identify the man.

Officers did not find a weapon, shell casings, bullets, or any other physical evidence at the scene.[8] Officers also determined that the .44 Magnum revolver Appellant brought to the police station in the backpack was not used to shoot Kimberly. Additionally, officers executed search warrants on Appellant's storage unit, a truck, and an abandoned house with which he was associated. They found several weapons in each location. Officers seized approximately 1500

---

[7]When Wagner returned to work and heard that someone had been shot in the park, she reported what she had seen to the police.

[8]Although investigators tested Appellant's hands for gunshot residue, a report had not been issued by the time of trial.

rounds of ammunition from the three locations.  Officers never found the weapon used to commit the offense.

Appellant testified on direct examination from his counsel to the following:

> Q.  Let's cut to the chase.  Were you at the park on June 22nd, 2009?
>
> A.  No, I wasn't.
>
> Q.  Were you at the Corinth Police Department on June 22nd, 2009?
>
> A.  Yes, I was.
>
> Q.  What did you go to the police station for, [Appellant]?
>
> A.  Basically to goad them into a hasty and presumptuous arrest.
>
> Q.  Was this on your own or was it pursuant to a plan?
>
> A.  Pursuant to a plan.
>
> Q.  How many people?
>
> A.  Me and four other individuals.
>
> . . . .
>
> Q.  Could you answer any and all questions concerning this plot or plan?
>
> A.  Except for the identities of my fellow political activists.  I will not reveal those identities.
>
> . . . .
>
> Q.  Did you shoot Kimberly Boggs?
>
> A.  No, I did not.

8

Q. Was shooting Kimberly Boggs a part of the plan or doing injury to anybody a part of this plan you speak of?

A. That would be counterproductive to the plan.

Q. Do you even know Kimberly Boggs?

A. Never even met her nor heard the name.

On cross-examination, Appellant explained that he and the four other individuals ("the group") established "the plan," under which the shooter, who resembled Appellant in appearance, and his "aid" would pick a day (during the week of June 22, 2009), pick a time (between 10:00 a.m. and 3:00 p.m.), and pick a public location. The shooter would then discharge a firearm into the air or into the ground without hurting anyone.[9]

Afterward, the group was supposed to send a prearranged signal to Appellant that it was time for him to appear at the police station.[10] Appellant was to be the "fall guy" or the "worm on a hook." By presenting himself at the police station soon after the shooting, he was "feed[ing] into [law enforcement's] assumptions, you know, the old, well, this guy must have done it, listen to this stuff, nut with a gun, we have this case solved." Appellant described the plan as

---

[9]Appellant explained that the event was supposed to be a "classic stereotyping type of nut" shooting guns into the air and bullets into the ground and "yelling something about Corinth corruption, stuff like that, and then running off leaving behind hopefully witnesses, a lot of excitement, media coverage, [and] overly excited police."

[10]According to Appellant, two of the group members did not participate but were "intellectually in agreement."

9

"political activism," the purposes of which were to showcase public corruption and to demonstrate how the police rush to judgment.

Appellant testified that he would know that the plan had been carried out when he saw a blue capsule secreted behind a hedge at the Emily Fowler Public Library in Denton. According to Appellant, the day of the shooting, he went to the library around 10:00 a.m., checked the designated spot approximately every hour, and eventually saw the blue capsule at 1:00 p.m. Soon thereafter, he went to the police station. Appellant acknowledged that no one could verify his story and that he did not have any corroborating evidence that the other members existed.

When the prosecutor asked whether the shooter had a green sedan that resembled Appellant's green Ford Focus, Appellant responded, "[T]hey knew what I was driving. How they acquired this, that, or the other, how they did that, that's up to them." Appellant testified that he instructed the group to obtain a black knapsack like the one he eventually took to the police station. Appellant did not remember whether the group recommended that the shooter read a book in the public place before the shooting.

Appellant acknowledged that he wanted the shooting to happen and that he knew it was going to involve a real firearm and real ammunition.[11] When the

---

[11]Appellant testified that the fact that Kimberly was shot was a "horrible awkwardness." He explained, "I know there was no intention -- I know the guy. There was never, like I said, even a -- a vague hint of any kind of harm coming to anybody, although we did know that we [were] shooting a gun . . . ."

prosecutor asked who supplied the gun, Appellant responded, "That was up to them. . . . I really didn't care." Appellant admitted that he was aware that weapons are dangerous, that loaded weapons can cause bodily injury, that handguns are deadly weapons, and that there are risks in firing a weapon.

As discussed in more detail in the opinion below, the court's charge instructed the jury on the law of criminal responsibility under penal code sections 7.01(a) and 7.02(b). *See* Tex. Penal Code Ann. §§ 7.01(a),[12] 7.02(b)[13] (West 2011). The court's charge authorized the jury to convict Appellant if it found him guilty of aggravated assault as a principal, or alternatively, if it found him guilty of aggravated assault as a party conspirator under section 7.02(b). The court's charge contained a general verdict form, and the jury found Appellant guilty of aggravated assault with a deadly weapon, as alleged in the indictment. The jury assessed punishment at twenty years in prison.

---

[12]Section 7.01(a) provides, "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or both." Tex. Penal Code Ann. § 7.01(a).

[13]Section 7.02(b) provides, "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." *Id.* § 7.02(b).

### III. Admission of Identifications (Issues One and Two)

In issues one and two, Appellant asserts that the trial court erred by admitting into evidence Kimberly's and Tracy's out-of-court identifications of him because "the identification procedure used by law enforcement was unduly suggestive in violation of Appellant's constitutional rights under [the] 14th Amendment of the United States Constitution and Art. 5 Sec. 19 of the Texas Constitution." The substance of Appellant's brief primarily challenges Kimberly's and Tracy's in-court identifications of Appellant.

### A. Standard of Review

The question of whether a pretrial identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor; therefore, we apply a de novo standard of review. *Gamboa v. State*, 296 S.W.3d 574, 581–82 (Tex. Crim. App. 2009).

### B. Applicable Law

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996). An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App.

12

2008) (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 828 (2000)), *cert. denied*, 130 S. Ct. 72 (2009).

To determine the admissibility of both pretrial identification and potentially tainted in-court identification, we ask, considering the totality of the circumstances, (1) whether the identification procedure was impermissibly suggestive and, if so, (2) whether the improperly suggestive procedure created a very substantial likelihood of irreparable misidentification. *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971; *Barley*, 906 S.W.2d at 33. The defendant must prove both elements by clear and convincing evidence. *Barley*, 906 S.W.2d at 33–34. Only if we determine that the pretrial identification procedure is impermissibly suggestive do we examine whether it tainted the in-court identification. *Id.* at 34.

## C. Applicable Facts

The trial court held a pretrial hearing on Appellant's motion in limine regarding the eyewitness identifications. At the hearing, Kimberly testified that when she and her family first arrived at the park, the only other person there was a white male sitting on a bench approximately fifty to sixty feet—or twenty steps—away from the picnic table where they sat, and he was reading a book. Kimberly further testified that when the man—whom she identified in court as Appellant—later walked toward her from the parking lot, she noticed he was thin. When Appellant got within approximately two feet, she noticed he had long gray

13

hair, "some really blue eyes," and that he held his neck "kind of cocked back."[14] Kimberly looked at Appellant for approximately five minutes as he talked to her and asked her questions about her son's Jeep before he shot her.

Kimberly testified that three or four hours after she was shot, a police officer came to the hospital, showed her a photo array, and asked her to pick out the person who shot her. Kimberly testified that she looked at the pictures for approximately ten minutes. She then testified, upon questioning by the State, as follows:

> Q. . . . [F]irst of all, did you recognize the person who shot you in the photographs?
>
> A. I did.
>
> Q. All right. How did that -- what happened? What did you say? What did you do?
>
> A. I believe I was between his picture and another. They looked similar. And as -- if I can recall, the picture that I was looking at was [Appellant's] driver's license picture with a blue background, which it did not look like him the day that -- the man that shot me because his hair was a lot shorter. But I could just -- you know, some similarities, but -- but there was another guy next to him. I think it was No. 5, I believe. They looked just really similar to me. But I did mention that No. 3 is kind of jumping out at me, I think. And [the officer] said, you know, you want to make sure. You know, you -- take your time. And I took a couple of more minutes, and then that's when I chose -- I don't remember -- No. -- No. 3, I think.
>
> Q. Okay. The person you chose in that line-up was not [Appellant]. Correct?

---

[14]At trial, Kimberly initially reiterated that she stood within two feet of Appellant, but after the prosecutor demonstrated this distance, Kimberly agreed that she probably stood within five to six feet of Appellant.

14

A. It was not.

Kimberly testified that later that night as she was watching the evening news from her hospital bed, a news story about the shooting aired and displayed a photograph of the suspected gunman. Kimberly immediately recognized Appellant as the man who shot her. No officers were present or prompted her to watch the newscast. Kimberly testified that the broadcast also showed a videotape of Appellant moving around and that it provided a better view than a photograph. Further, she testified in response to the State's question, as follows:

> Q. . . . If you had never seen the photographic line-up that [the police officer] showed to you, if you had never seen the photograph that was put on the news at -- later that night, would you know if you -- would you recognize if you saw the person who shot you back on June 22nd of 2009?
>
> A. Yes.
>
> Q. All right. Do you see him here in court today?
>
> A. Yes, I do.
>
> Q. If you -- if those other photos didn't exist, could you still identify him here today?
>
> A. Yes, I can.
>
> Q. Any questions in your mind about that?
>
> A. Absolutely not.

Appellant did not elicit any significant controverting testimony during his cross-examination of Kimberly.

Tracy testified that when he and his family arrived at the park, he noticed a gentleman sitting on a park bench reading a book. He saw only the man's profile at first but noticed the way the man held himself. When the gentlemen commented about G.B.'s Jeep getting stuck, Tracy looked at him when responding and noticed that the man had long, scraggly hair and a medium-sized nose. Tracy also glanced at the man when he went to help G.B. Tracy identified Appellant as the man he saw in the park. On cross-examination, Tracy testified that he was at the park approximately fifteen to twenty minutes before he went home to get a new battery for the Jeep and that he got within six to seven feet of Appellant when he went to help his son with the Jeep.

Tracy testified that around 5:15 p.m. that same day, he went to the Corinth Police Department, where he was shown a photographic lineup by Captain Wilkerson. Tracy looked at the lineup for approximately ten to thirteen seconds, selected Appellant's picture, and stated, "I think that this is him." He further testified that when Captain Wilkerson asked him how certain he was, he responded, "70-30, 70 percent / 30 percent on it." Tracy agreed with the prosecutor that Captain Wilkerson had stated in an offense report that Tracy had been thirty percent sure; however, Tracy reiterated that he recalled saying seventy-thirty. Tracy identified Appellant in court as the man he saw at the park and testified that he still would have recognized him even if he had never seen the photographic lineup.

On cross-examination by Appellant's counsel, Tracy testified as follows:

16

Q. And then they went on to ask you on a percentage scale that the individual you chose, you think it is him, on a percentage scale, you were asked to quantify it. And you're saying contrary to this report, your answer was 70-30, not quote, about 30 percent, unquote?

A. (Pause) Yes, sir.

Q. Yes, sir, you -- did you say about 30 percent?

A. No, sir.

Q. So the police have it incorrect?

A. I'm not saying the police had it incorrect. I believe whenever I stated 70-30, I believe that it wasn't clarified or --

Q. Well, clarification aside, did you state, quote, I'm only about 30 percent, unquote?

A. I don't recall.

Tracy also testified that he saw news footage that evening that showed a picture of Appellant.

At the conclusion of the hearing, the trial court overruled and lifted Appellant's motion in limine and ruled that the State would be allowed to present the out-of-court and in-court identifications. At trial, Kimberly and Tracy provided essentially the same (albeit somewhat more detailed) testimony, and they identified Appellant in court in front of the jury as the man in the park. Appellant vigorously cross-examined Kimberly and Tracy about their opportunities to view Appellant in the park, about their out-of-court identifications, and about the fact that they saw Appellant's picture on the news.

17

## D. Application of Law to Facts

On appeal, Appellant asserts that it was improper

> to allow [an] in-court identification of Appellant when a witness is wrong or substantially unsure of the choice of a picture from a photo array of suspects but then is allowed to pick Appellant because (1) Appellant is the sole "suspect" according to television broadcasts which showed Appellant's picture and (2) in trial, Appellant is the sole male sitting at the counsel table other than Trial Counsel. This sequence of events, particularly the superceding broadcast, is the procedures of which the Appellant complains.
>
> . . . .
>
> The Boggs['s] opportunity to view the assailant were limited as they addressed their attention on the two children. . . . [Also, the] very uncertain (or outright wrong) selection of a picture out of the photo array is very weak identification evidence. . . . A news broadcast all but concluded that Appellant was [the] assailant and gave the viewer no other suspects. Ms. Boggs watched that broadcast. The superceding event caused harm to Appellant as the Boggs then change[d] their story. After the news, they are 100% confident. Their confidence is supported then by his very presence in court two years later. The procedure as a whole is unfairly unreliable.

The State asserts that despite Appellant's stated issues presented for review, *see* Tex. R. App. P. 38.1(f), he has not pointed this court to any procedures in the out-of-court photographic lineups shown to Kimberly and Tracy that were impermissibly suggestive.[15] Indeed, Appellant instead focuses on the

---

[15]Suggestiveness may arise from the manner in which the pretrial identification is conducted if, for example, police point out the suspect or suggest that a suspect is included in the photo array. *Barley*, 906 S.W.2d at 33. Also, the content of the photo array is considered unduly suggestive if, for example, other participants are greatly dissimilar in appearance from the suspect. *Id.*

18

"superceding broadcast."[16]  Citing *Rogers v. State*, the State asserts that "the mere fact that appellant's picture aired in a news broadcast, which Kimberly and Tracy Boggs saw *after* viewing the photo lineups, cannot properly be factored into the analysis of whether the lineup process was suggestive, as the news broadcast was not a part of any law enforcement procedure."  774 S.W.2d 247, 259–60 (Tex. Crim. App.), *cert. denied*, 493 U.S. 984 (1989), *overruled on other grounds by Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003); *see Craig v. State*, 985 S.W.2d 693, 694 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

In *Rogers*, several witnesses identified a capital murder suspect from a lineup.  774 S.W.2d at 259.  The day before, the witnesses had seen a newspaper picture of the suspect being arrested.  *Id.*  At trial, the witnesses again identified the accused.  *Id.*  On appeal, Rogers complained that the trial court should have suppressed the witnesses' in-court identifications because they were tainted by the suggestive out-of-court photograph.  *Id.*  In overruling this point, the court of criminal appeals stated,

> Given the absence of any official action contributing to the likelihood
> of misidentification in this case [from seeing the defendant's photo in
> a newspaper article about his arrest], the constitutional sanction of

---

[16]We agree with the State that Appellant does not set forth a substantive argument that the out-of-court photographic lineups shown to Kimberly and Tracy were impermissibly suggestive.  As the State points out, Appellant's argument more closely tracks the second prong of the *Simmons* analysis; that is, whether an improperly suggestive procedure created a very substantial likelihood of irreparable misidentification.  *See Simmons,* 390 U.S. at 384, 88 S. Ct. at 971; *see Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972); *Luna*, 268 S.W.3d at 605.

19

inadmissibility should not be applied, regardless of the extent to which any witness's in-court identification might have been rendered less reliable by prior exposure to the newspaper photograph.

Of course, witnesses who viewed it might have been inclined to identify appellant from the photo and not from a clear recollection of the live events seen by them several days earlier, as was indeed the case with one witness. But the six other witnesses here in question were, so far as the record reflects, not affected in their ability to make an accurate identification of appellant by the challenged newspaper photograph. Since the police procedure was not itself suggestive, the fact that several eyewitnesses were exposed to a media photo of appellant one day before attending a police lineup might, at most, be taken to affect the weight, although not the admissibility, of their trial testimony.

*Id.* at 260 (citations omitted).

The United States Supreme Court recently held that "what triggers due process concerns [regarding the admission of eyewitness identification] is *police use* of an unnecessarily suggestive identification procedure." *Perry v. New Hampshire*, 132 S. Ct. 716, 721 n.1 (2012) (emphasis added). The Supreme Court stated:

An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action

20

and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at 720–21 (citation and footnote omitted).

Here, there is no evidence that law enforcement officials arranged for Kimberly and Tracy to watch the news to see a photograph of Appellant. Because Appellant does not challenge the suggestiveness of the pretrial photo lineups and because no state action was involved in Kimberly's and Tracy's sighting of Appellant's photograph on the news, Appellant fails to establish that the out-of-court identification procedures in this case were impermissibly suggestive. *See Bell v. State*, Nos. 03-11-00247-CR, 03-11-00248-CR, 03-11-00249-CR, 03-11-00250-CR, 03-11-00251-CR, 2012 WL 3797597, at *6–9 (Tex. App.—Austin Aug. 28, 2012, no pet.) (mem. op., not designated for publication) (rejecting Bell's argument that witness's in-court identification was tainted by having previously viewed a photograph on the Internet identifying Bell as a suspect in the offense). Thus, we do not reach the second prong of the *Simmons* analysis; that is, we do not examine whether the out-of-court identification procedures tainted the in-court identifications.

We note, however, that several safeguards noted in *Perry* were at work in Appellant's trial. In addition to the fact that the trial court held a pretrial hearing to

21

determine the reliability of Kimberly's and Tracy's identifications, Appellant vigorously cross-examined Kimberly and Tracy in front of the jury about their identifications. Based on Kimberly's and Tracy's testimony, Appellant's counsel reminded the jury in closing argument that "three and a half hours after the fact, [Kimberly] pick[ed] the wrong person." Regarding Tracy, he argued, "Some five hours after being in a park, an ID, even though it wasn't run with the correct protocol, an identification, thirty percent?" Counsel further argued, "And then all of [a] sudden, Kimberly and Tracy Boggs see the news footage, and now any type of identification is going to be tainted because they've seen [my client] as the individual arrested as the man in the park." Counsel concluded by arguing, "There were two people that say they saw the individual. One person selected somebody else who is still roaming Denton County supposedly, and the other one is 30 percent certain. . . . You're asked to find [Appellant] guilty beyond a reasonable doubt, the highest standard we have." The jury charge required that Appellant's guilt be established beyond a reasonable doubt.

Additionally, Kimberly and Tracy confidently stated that their in-court identifications were based exclusively on their recollections of seeing Appellant at the park. *See Rogers*, 774 S.W.2d at 259–60. Kimberly testified that she spoke with Appellant face-to-face at a distance of five to six feet in broad daylight while he asked her several questions. Tracy testified that he looked at Appellant when he responded to Appellant's comment that G.B.'s Jeep was stuck. Both Kimberly and Tracy unequivocally testified before and during trial that seeing Appellant's

22

photograph on the news broadcast did not influence their in-court identifications of Appellant.

Based on our de novo review of the totality of the circumstances, we conclude that the trial court did not err by overruling Appellant's objection to the admissibility of Kimberly's and Tracy's out-of-court and in-court identifications of Appellant as the man in the park who shot Kimberly. We overrule issues one and two.

## IV. Sufficiency of the Evidence to Prove Identity (Issue Three)

In his third issue, Appellant asserts that the evidence is insufficient to support his conviction because the witnesses did not adequately or fairly identify him as the shooter. He specifically contends that no witnesses confidently identified him near the time of the offense.

## A. Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at

319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B. Application of Law to Facts

As we discussed above, Kimberly and Tracy unequivocally identified Appellant in court as the shooter. The positive identification of a defendant as the perpetrator is sufficient to support a conviction. *See Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Cate v. State*, 124 S.W.3d 922, 928–29 (Tex. App.—Amarillo 2004, pet. ref'd); *see also Aguilar v. State*, 468

24

S.W.2d 75, 77 (Tex. Crim. App. 1971) (holding that the testimony of one eyewitness alone is sufficient to support jury's verdict); *Leadon v. State*, 332 S.W.3d 600, 607 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (same); *Walker v. State*, 180 S.W.3d 829, 832 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Pitte v. State*, 102 S.W.3d 786, 794 (Tex. App.—Texarkana 2003, no pet.). Accordingly, the jury could have reasonably concluded beyond a reasonable doubt that Appellant was the man in the park who shot Kimberly based on the identification testimony alone.

Moreover, additional, circumstantial evidence established that Appellant committed the instant crime. *See Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd) (holding that identity may be proven by direct or circumstantial evidence, or even by inferences). For instance, Evelia Lopez testified that as she drove to pick up her nephew from school around the time of the shooting, she saw a four-door green car parked with "dark" windows in the parking lot at Fairview Park.[17] When she drove to the park immediately thereafter, the car was gone. Responding Officer Kevin Tyson testified that Kimberly said that the car she saw Appellant walk toward in the park's parking lot was small and had four doors. The afternoon of the shooting, Appellant arrived

---

[17]Kimberly described the car as gray and also "dark colored," and there was evidence that Appellant's car did not have tinted windows. We must presume, however, that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

25

at the Corinth Police Department in a little green four-door Ford Focus; Appellant testified that he owned the car.

Furthermore, both Kimberly and Tracy testified that they saw Appellant with a black backpack at the park. Lieutenant Stacy testified that after Appellant arrived at the police station, Appellant invited him to retrieve a black backpack from the back seat of his green car. When Lieutenant Stacy found a .44 Magnum revolver in the backpack and asked about its significance, Appellant stated, "It's about the incident in the park."[18] Also, Kimberly and Tracy both testified that Appellant was reading a book in the park, and Appellant made a point of getting a book out of his car before going into the police station with Lieutenant Stacy. Moreover, Captain Wilkerson testified,

> At that time Lieutenant Stacy called me on the telephone to explain what -- what was going on at the police station. I had received information from officers on the radio that there was a gray-headed suspect, white male, about five eight with a pony tail possibly driving a green vehicle. I asked Lieutenant Stacy, "Does he have a pony tail?"
>
> "Yes, he does."
>
> "Does he have a green vehicle?"
>
> He said yes. I said, "I believe that's our suspect. Detain him."

---

[18]Appellant denied making this statement; however, the jury was free to disbelieve his testimony. Throughout trial, the State emphasized this statement. The jury was free to give this statement some weight in light of Appellant's testimony that he was secluded the day of the shooting and that he had made suggestions about where the shooting should occur but that he did not know the location the other members ultimately chose.

Also, Margaret Wagner testified that she saw a man matching Appellant's general description in the park at the time of the shooting wearing a baseball cap and carrying trash bags. Although Kimberly did not see Appellant wearing a baseball cap or carrying trash bags, Lieutenant Stacy testified that Appellant had three baseball caps in the front seat of his car, and Appellant testified that he had black trash sacks in his backpack.

The jury also could have reasonably construed Appellant's version of events as implausible, thereby demonstrating a "consciousness of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that implausible explanations are probative of wrongful conduct and are circumstances of guilt); *Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd); *see Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (recognizing that fact finder can consider a defendant's untruthful statement as affirmative evidence of guilt).

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Appellant committed aggravated assault by shooting Kimberly with a firearm. We overrule Appellant's third issue.

## V. The Sufficiency of the Evidence to Prove Parties Conspiracy (Issue Four)

In his fourth issue, Appellant asserts that the jury verdict is based on insufficient evidence because "the State failed to present evidence supporting its

27

unnecessary Jury Charge definitions and terms . . . ." The jury charge stated in part,

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with the commission of the offense.[19]

> "Conspiracy" means an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties.[20]

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, th[e]n all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Aggravated assault, deadly conduct, and terroristic threat are felony offenses.[21]

The application paragraphs of the jury charge provided:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of June, 2009 in Denton County, Texas, the defendant, WILLIAM GILMORE, did then and there intentionally, knowingly, or recklessly cause bodily injury to Kimberly

---

[19]This instruction tracks a portion of the language in section 7.01 of the penal code. *See* Tex. Penal Code Ann. § 7.01(a), (b).

[20]This definition of conspiracy tracks a portion of the criminal conspiracy statute. *See id.* § 15.02 (West 2011). As discussed in the opinion below, the court of criminal appeals has found no error in defining the term "conspiracy" in this way. *Ladd v. State*, 3 S.W.3d 547, 565 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000).

[21]This instruction tracks the language in section 7.02(b) of the penal code. *See* Tex. Penal Code Ann. § 7.02(b).

Boggs by shooting Kimberly Boggs with a deadly weapon, to-wit: a firearm; as alleged in the indictment, you will find the defendant guilty of aggravated assault, as charged in the indictment.

OR

If you find from the evidence beyond a reasonable doubt that on or about the 22nd day of June, 2009 in Denton County, Texas the defendant, WILLIAM GILMORE, entered into a conspiracy with one o[r] more unnamed persons to commit the felony offense of aggravated assault, deadly conduct, or terroristic threat and that in the attempt to carry out this conspiracy, if any, one or more of the conspirators did then and there intentionally, knowingly, or recklessly cause bodily injury to Kimberly Boggs by shooting Kimberly Boggs with a deadly weapon, to-wit: a firearm; as alleged in the indictment, you will find the defendant guilty of aggravated assault, as charged in the indictment.

The court's charge contained a general verdict form, and the jury found Appellant guilty of aggravated assault with a deadly weapon, as alleged in the indictment.

Citing to section 15.02 of the penal code—the statute for the offense of criminal conspiracy—Appellant argues that "the State's selection of conspiracy terms in the Jury Charge gives it the extra burden which was not met." *See* Tex. Penal Code Ann. § 15.02 (West 2011).[22] Appellant asserts that "the corpus delicti of conspiracy must contain a showing of agreement to commit a crime" and that "there was no showing at trial beyond the confession itself that there had

---

[22]Section 15.02 provides in part that "(a) A person commits criminal conspiracy if, with intent that a felony be committed: (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement." *Id.* § 15.02.

29

been an agreement to commit the [shooting]." Citing to *Brown v. State*, 576 S.W.2d 36, 43 (Tex. Crim. App. [Panel Op.] 1978) (op. on reh'g), he contends that "[w]hen there is no corpus delicti, a confession cannot stand." *Id.* He continues,

> Had there been some showing of concerted activity directed toward commission of the offense, or had someone come forward to testify as to the existence of the agreement, the confession would have been sufficient to sustain the conviction. Absent any evidence of the corpus delicti of conspiracy, outside the extrajudicial confession itself, the conspiracy conviction founded on that confession cannot stand.
>
> If the State wishes to use "conspiracy" for one reason, it must use it for all purposes in the Jury Charge. In the alternative, it must simply rely o[n] the elements of the actual offense. No evidence exists in the record that an agreement to conspire existed other than the insufficient testimony by Appellant.

The State responds that Appellant confuses the crime of conspiracy found in section 15.02 of the penal code with an instruction on the law of parties found in section 7.02(b). The State further responds that article 38.14—requiring corroboration of accomplice-witness testimony—does not apply to a defendant's own testimony and that no Texas case law requires an appellant's trial testimony to be corroborated in order to stand as evidence in support of his conviction.

To the extent Appellant argues that the evidence is insufficient to prove he committed the offense of criminal conspiracy under section 15.02, he was not charged with, and the jury was not instructed on, this offense. *Compare* Tex. Penal Code Ann. § 7.02(b) *with* Tex. Penal Code Ann. § 15.02. Thus, his

30

reliance on *Brown* and the doctrine of corpus delicti in this context is misplaced.[23] *See* 576 S.W.2d at 43 ("Absent any evidence of the corpus delicti of conspiracy, outside the *extrajudicial confession* itself, the conspiracy conviction founded on that confession cannot stand.") (emphasis added). The charge in Appellant's case authorized the jury to convict Appellant if it found him guilty of aggravated assault as a principal, or alternatively, if it found him guilty of aggravated assault as a party conspirator under section 7.02(b).[24]

To the extent Appellant argues that the State failed to prove he was criminally responsible for aggravated assault as a party conspirator, we need not conduct such a sufficiency analysis. *See Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). When a trial court's charge authorizes the jury to

---

[23]"The purpose of [the corpus delicti] rule is to ensure that a person is not convicted based solely upon his own extrajudicial false confession to a crime that never occurred." *Menefee v. State*, 287 S.W.3d 9, 21 (Tex. Crim. App. 2009) (Cochran, J., concurring); *see Bible v. State*, 162 S.W.3d 234, 246 (Tex. Crim. App. 2005) ("The *corpus delicti* doctrine requires that evidence independent of a defendant's extrajudicial confession show that the 'essential nature' of the charged crime was committed by someone.") (quoting *Salazar v. State*, 86 S.W.3d 640, 644–45 (Tex. Crim. App. 2002)).

[24]"[U]nder the law of parties, the State is able to enlarge a defendant's criminal responsibility to acts in which he may not be the principal actor." *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1171 (1997); *see Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011) ("While the parties theory was not plead[ed] in the indictment, both state and federal law specify that due process does not require a defendant's culpability as a party to the offense to be plead in the charging instrument."), *cert. denied*, 132 S. Ct. 1763 (2012). An instruction on the law of parties should be submitted to the jury when the evidence adduced at trial shows the active participation in the offense by two or more persons. *See Goff*, 931 S.W.2d at 544–45.

31

convict on alternative theories, the verdict of guilt will be upheld if the evidence was sufficient on any one of the theories. *Grissam v. State*, 267 S.W.3d 39, 41 (Tex. Crim. App. 2008); *Swearingen*, 101 S.W.3d at 95; *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992) ("[W]hen the jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld."), *cert. denied*, 509 U.S. 926 (1993); *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.—Fort Worth 2008, pet. ref'd). Here, the court's charge authorized the jury to convict Appellant if it found him guilty of aggravated assault as a principal or as a party conspirator under section 7.02(b). Because we have previously held that the evidence was sufficient to support a jury finding that Appellant was guilty of aggravated assault as a principal, we need not determine whether sufficient evidence showed that Appellant was guilty of aggravated assault as a party conspirator under section 7.02(b).

To the extent Appellant complains generally that the evidence was insufficient to support the trial court's decision to charge the jury on the law of parties, we conclude it is unnecessary to make this determination.[25] "In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally

---

[25]To the extent Appellant complains that the trial court erred by applying "the principle of 'conspiracy'" under section 15.02 in the jury charge, he raises this, and we address it, in his fifth issue.

32

responsible under the law of parties." *See Ladd*, 3 S.W.3d at 564 (citing *McCuin v. State*, 505 S.W.2d 827, 830 (Tex. Crim. App. 1974)). Nonetheless, when "'the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless.'" *Ladd*, 3 S.W.3d at 564–65 (quoting *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986)); *Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) ("Even where proper objection is made at trial, we have held that where, as in the instant case, the evidence clearly supports a defendant's guilt as the primary actor, error in charging on the law of parties was harmless."), *cert. denied*, 528 U.S. 1082 (2000). Here, the State focused at trial on the theory that Appellant was a principal actor, and as discussed in issue three, the evidence clearly supports Appellant's guilt as a principal actor. In light of the evidence in this case, "the jury almost certainly did not rely upon the parties instruction in arriving at its verdict, but rather based the verdict on the evidence tending to show appellant's guilt as a principal actor." *Ladd*, 3 S.W.3d at 565. Thus, any error in charging the jury on the law of parties under penal code section 7.02(b) was harmless. *See id.* at 564−65. We overrule Appellant's fourth issue.

## VI. Jury Charge (Issues Five through Fourteen)

In these several issues, Appellant contends that the jury charge contained "a variety of ill-fitting and improper definitions without corresponding offenses set forth in the Texas Penal Code" and that the trial court erred by denying the several lesser-included offense instructions he requested.

## A. Standard of Review

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error did occur, whether it was preserved determines the degree of harm required for reversal. *Id.*

## B. Defining and Applying Parties Conspiracy

In issue five, Appellant asserts that because the indictment did not charge the offense of conspiracy, the trial court erred by applying "the principle of 'conspiracy'" under section 15.02 of the penal code in the jury charge. In his fourteenth issue, Appellant asserts that the trial court erred in applying the law of parties (under section 7.02(b)), while not charging the jury on the offense and lesser-included offense of conspiracy (under section 15.02).

The court of criminal appeals's *Montoya v. State* case addresses Appellant's fifth issue and is instructive:

> Appellant argues that the inclusion of the theory of conspiracy in the court's charge over his objection constituted fundamental error because the offense of conspiracy had not been alleged in the indictment. He reminds us that criminal conspiracy is an offense under [section 15.02 of the penal code], and argues that since he had no notice he was being charged with the offense of criminal conspiracy, the jury was erroneously instructed on an alternate theory of conviction.
>
> Appellant is mistaken in his argument. The court's charge did not instruct the jury to consider whether appellant was guilty of the

34

separate offense of criminal conspiracy as set out in Section 15.02, supra. Rather the court's charge merely contained an alternative "parties" charge as provided in V.T.C.A., Penal Code, Section 7.02(b).

. . . .

It is well accepted that the law of parties may be applied to a case even though no such allegation is contained in the indictment. This rule applies not only to the law of parties found in Section 7.02(a)(2) but also the law of parties found in Section 7.02(b).

810 S.W.2d 160, 165 (Tex. Crim. App. 1989) (citations omitted), *cert. denied*, 502 U.S. 961 (1991); *see Moses v. State*, No. 04-09-00211-CR, 2011 WL 1402840, at *3–5 (Tex. App.—San Antonio Apr. 13, 2011, pet. ref'd) (mem. op., not designated for publication); *see also* 8 Michael J. McCormick et al., *Texas Practice: Texas Criminal Forms and Trial Manual* § 104.2 n.1 (11th ed. 2005) ("It is proper to instruct the jury on the evidentiary law of conspiracy without the defendant being charged with the offense of criminal conspiracy.") (citing *Montoya*).

Moreover, the court of criminal appeals in *Ladd* upheld as proper a jury charge that contained definitions similar to the ones in this case. In *Ladd*, as in this case, the court's charge tracked section 7.02(b), and it contained a definition of conspiracy that tracked a portion of section 15.02. *See* 3 S.W.3d at 565. The court of criminal appeals noted that the penal code does not define "conspiracy" as that term is used in section 7.02(b) and that although the trial court need not have defined the term, it "certainly did not err in instructing the jury to give the term its commonly understood meaning." *Id.*; *see Montoya*, 810 S.W.2d at 164–

65; *Moses*, 2011 WL 1402840, at *5. Thus, the trial court did not err in overruling Appellant's "objection to the State's addition of the principle of 'conspiracy'" to the jury charge. Moreover, as noted in issue four, because the evidence clearly supports Appellant's guilt as a principal actor, any error by the trial court in charging the jury on the law of parties under penal code section 7.02(b) was harmless. *See Ladd*, 3 S.W.3d at 564–65; *Cathey*, 992 S.W.2d at 466.

## C. Separate and Lesser-Included Offenses

In issues six through fourteen, Appellant asserts that the trial court erred in denying his request to charge the jury on certain offenses—including (1) the "separate offenses" of conspiracy, deadly conduct, terroristic threat, and conspiracy to commit terroristic threat and (2) the lesser-included offenses of conspiracy, deadly conduct, and terroristic threat—because the State was permitted to use the definitions of these offenses and some evidence of these offenses was present.

### 1. Definitions

The court's charge defined conspiracy (addressed above), deadly conduct,[26] and terroristic threat.[27] The parties-conspiracy application paragraph

---

[26]The court's charge instructed, "A person commits deadly conduct if he knowingly discharges a firearm at or in the direction of one or more individuals."

[27]The court's charge instructed, "A person commits terroristic threat if he threatens to commit any offense involving violence to any person or property with intent to place the public or a substantial group of the public in fear of serious bodily injury."

36

authorized the jury to find Appellant guilty if it found that he "entered into a conspiracy with one o[r] more unnamed persons to commit the felony offense of aggravated assault, deadly conduct, or terroristic threat and that in the attempt to carry out this conspiracy, if any, one or more of the conspirators did then and there intentionally, knowingly, or recklessly cause bodily injury to Kimberly Boggs by shooting [her] with a deadly weapon . . . ."  The State asserts that the trial court properly included the felony offenses of deadly conduct and terroristic threat in the parties conspiracy application paragraph and properly defined these offenses in the abstract portion of the charge.  The State explains that

> Appellant testified that actually shooting a person, *i.e.*, committing aggravated assault with a deadly weapon, would be counterproductive to the plan, but Appellant testified to a plan that, had it been carried out, certainly would have constituted the felony offenses of deadly conduct and terroristic threat. . . .  Appellant testified that he and his co-conspirators were aware of the dangerous risks inherent in their plan but proceeded anyway. Appellant admitted being integral to the plan that, even though it excluded the commission of aggravated assault with a deadly weapon, resulted in the commission of the shooting of Kimberly Boggs. . . .
>
> . . . Thus, the trial court properly instructed the jury, as raised by the evidence, that if Appellant entered into a conspiracy with four unnamed co-conspirators to commit a felony offense, and another felony offense was committed, then Appellant was properly guilty of the felony actually committed. [Footnote and internal record citations omitted.]

Appellant's brief does not contain a substantive argument or supporting authority as to how or why the trial court erred in defining deadly conduct and terroristic threat in the abstract portion of the charge and in listing these offenses

37

in the application paragraph in the charge;[28] instead, the brief provides that "if the jury is to consider definitions outside of the aggravated assault with a deadly weapon language then allow the jury to consider applying the definition to the related but separate crime[s]." In light of the argument set forth in Appellant's brief, we cannot say that the trial court erred by defining deadly conduct and terroristic threat in the abstract portion of the charge and in listing these offenses in the parties conspiracy application paragraph. Further, and as noted in issue four, because the evidence clearly supports Appellant's guilt as a principal actor, any error by the trial court in charging the jury on the law of parties under penal code section 7.02(b) was harmless. *See Ladd*, 3 S.W.3d at 564–65; *Cathey*, 992 S.W.2d at 466.

### 2. Separate Offenses

Appellant's brief contains no substantive argument or supporting authority regarding how or why the trial court erred in failing to submit to the jury the "separate" and unindicted offenses of criminal conspiracy under section 15.02, deadly conduct, terroristic threat, and conspiracy to commit terroristic threat.[29] Without additional argument or authority, we cannot say that the trial court erred

---

[28]That is, the brief merely complains that the party conspiracy instruction should not have been submitted.

[29]That is, the brief merely complains that the definitions of these offenses were provided to the jurors.

in failing to submit instructions on "separate offenses" as requested by Appellant.[30]

### 3. Lesser-Included Offenses

A defendant may be convicted of an unindicted offense that is a "lesser-included offense" of the charged crime. *See Wasylina v. State*, 275 S.W.3d 908, 910 (Tex. Crim. App. 2009). We use a two-step analysis to determine whether a defendant was entitled to a lesser-included offense instruction. *See Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). First, the lesser offense must come within article 37.09 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006); *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). Under article 37.09, an offense is a lesser included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

---

[30]We take note of *Woodard v. State*, 322 S.W.3d 648 (Tex. Crim. App. 2010). In *Woodard*, the court of criminal appeals reaffirmed (1) a defendant's due process right to notice of the charge against him; (2) the Fifth Amendment's grand jury guarantee that no person "shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury"; and (3) the Texas constitution's guarantee that "no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury . . . ." *Id.* at 656–57. Notably, however, Woodard was indicted for murder and convicted of the unindicted offense of conspiracy to commit aggravated robbery. *Id.* at 649. After setting out the above guarantees, the court held that Woodard could not complain for the first time on appeal that the trial court erred by instructing the jury on the unindicted offense, because he had helped to prepare the jury charge, including the instruction relating to the unindicted offense, to which the State unsuccessfully objected. *Id.* at 657–60.

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

Tex. Code Crim. Proc. Ann. art. 37.09. Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *See Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672−73.

Appellant's brief discusses the trial objections and requests he made during the charge conference as to the lesser-included offenses. The brief also sets out the statutes for criminal conspiracy (section 15.02), deadly conduct (section 22.05), and terroristic threat (section 22.07). *See* Tex. Penal Code Ann. §§ 15.02, 22.05, 22.07 (West 2011). The brief also states,

Applying the first step of the lesser included-offense analysis in this case, evidence presented at trial would cover a broad range of offenses against the person. . . . .

The elements of the lesser included offenses requested by Trial Counsel establish the same or less than all the facts required to establish[] the commission of the offense charged of aggravated assault with a deadly weapon. The evidence adduced at trial could support the lesser included offenses of conspiracy, deadly conduct, terroristic threat and/or conspiracy to commit aggravated assault with a deadly weapon.

Appellant's brief contains neither specific arguments nor citations to any authority that might support a conclusion that the named offenses satisfy the first prong of

40

the analysis. *See Cavazos v. State*, No. PD-1675-10, 2012 WL 5348046, at *3 (Tex. Crim. App. Oct. 31, 2012) ("The first step is a question of law, and it does not depend on the evidence raised at trial."). In addition, Appellant's brief fails to address the second prong of the analysis; that is, Appellant's brief contains no citations to the record and no argument or citation to any authority that might support an argument that if he is guilty, he is guilty only of the lesser offenses. *Id.* at *4 ("This second step is a question of fact and is based on the evidence presented at trial."). Without more, we have no basis to say that the trial court erred in failing to instruct the jury on the lesser-included offenses of conspiracy, deadly conduct, terroristic threat, and conspiracy to commit aggravated assault with a deadly weapon. *See Lucio v. State*, 351 S.W.3d 878, 895–96 (Tex. Crim. App. 2011) (holding that appellant's claim that the trial court erred by failing to provide her requested jury instruction on a lesser-included offense was inadequately briefed, and thus, the court did not consider it because it was "under no obligation to make appellant's arguments for her"), *cert. denied*, 132 S. Ct. 2712 (2012). We overrule issues five through fourteen.

## VII. Conclusion

Having overruled Appellant's fourteen issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

PUBLISH

DELIVERED:  December 21, 2012