# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


**NO. 02-13-00382-CR**
**NO. 02-13-00383-CR**

TYLER RAYLEN COLBERT                                         APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant Tyler Raylen Colbert pleaded guilty to aggravated robbery, a first degree felony, and burglary of a habitation, a second degree felony, in exchange for a $1,000 fine and ten years' deferred adjudication community supervision in each case. Several months after the trial court entered the June 12, 2012 deferred adjudication orders, the State filed in both cases petitions to proceed to

---

[1]*See* Tex. R. App. P. 47.4.

adjudication and then first amended petitions, alleging that (1) Colbert had committed a burglary of a habitation on or around September 18, 2012; (2) Colbert had associated with persons who were known to him as disreputable and harmful characters; and (3) Colbert had committed a burglary of a habitation on or about August 21, 2012.

At the revocation hearing, the State waived the first two paragraphs in both cases. Colbert pleaded "not true" to the third paragraph in both cases. The trial court found the third paragraph true in both cases and entered judgments adjudicating Colbert's guilt of his original offenses and sentencing him to twenty years' confinement for the aggravated robbery and ten years' confinement for the burglary, to be served concurrently. These appeals followed.

## II. Revocation

In his two issues, Colbert argues that the trial court abused its discretion because the evidence was insufficient to support finding the State's third paragraph true in each case.

### A. Standard of Review

We review the trial court's decision to revoke community supervision for an abuse of discretion. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006). The trial court does not abuse its discretion if the order revoking community supervision is supported by a preponderance of the evidence, that is, if the greater weight of the credible evidence would create a reasonable belief that the defendant has violated a condition of his community supervision. *Id.* at

2

763–64; *Edwards v. State*, 54 S.W.3d 834, 835 (Tex. App.—Fort Worth 2001, pet. ref'd). In conducting our review, we view the evidence in the light most favorable to the trial court's ruling. *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). We defer to the trial court's resolution of disputed facts and to any reasonable inferences that can be drawn from those facts. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. [Panel Op.] 1981); *Lawrence v. State*, No. 02-13-00021-CR, 2014 WL 51366, at *1 (Tex. App.—Fort Worth Jan. 2, 2014, no pet.).

## B. Evidence

### 1. State's Case

After Colbert's probation officer testified that she had reviewed with Colbert the community supervision term that forbade him from committing violations of law and that Colbert had acknowledged that he understood it, Tresmon Patel-Nickerson gave his version of the events of August 21, 2012. Tresmon, who had been living with Colbert and Colbert's family at the time, said that Colbert told him that he wanted to "[h]it a lick"[2] on a house that belonged to Colbert's younger

---

[2]Tresmon explained that to "hit a lick" meant to "break into a house and steal everything out of it."

brother A.N.C.'s[3] friend when no one was expected to be home. Tresmon said that A.N.C. told him that some event was happening at the YMCA.

Tresmon said that it was late in the evening but still daylight when he and Colbert drove to the house; Tresmon was in the passenger's seat. Colbert stopped the minivan a couple of blocks away from the target house and asked Tresmon again if he "wanted to hit the lick with him." Tresmon said that he declined, exited the vehicle, and started walking away towards Colbert's house. Tresmon said that as he walked away, he turned around and saw Colbert get out of the vehicle, go up to the house, and later emerge from the house with a television.

Tresmon agreed that when the police first questioned him about the burglary, he did not immediately tell them the truth but said that he eventually told them what he had seen. He stated that he did not immediately tell the truth because he was scared and did not want to be involved. He was seventeen at the time of the burglary, and he said that the police told him that they would not charge him with the burglary.

During cross-examination, Tresmon agreed that the police told him that others had placed him at the scene. He also said that he was testifying to prevent charges being brought against him and acknowledged that he told the police that he smoked marijuana but said that he did not recall whether he had

---

[3]To protect their identities, we refer to the minor children by their initials.

smoked it on the day of the burglary.  When asked about the written statement he had given to police indicating that Colbert had taken two televisions instead of one, Tresmon said that it had been two televisions.

Tresmon also said that he did not recall what kind of hairstyle he had in August 2012 but denied that it could have been a box cut with a gold ducktail on the back.  He acknowledged that his hair had been dyed or bleached at one point but said that he had cut it off for school.  He agreed that he had access to the keys to the van and drove it occasionally.  Tresmon said that as he was walking back home, he saw A.N.C. walking down the street and saw Colbert pick him up in the van.

D.W., who was fourteen years old, testified that the burglary had occurred in the afternoon.  From her upstairs window, she had seen two African-American men—one older and one younger—drive up in a white van and go into her next-door neighbor's house through the front door.  The men carried out two flat screen televisions and put them in the van.  D.W. yelled for her brother to call 9-1-1, and he told her to be quiet because the men might hear her.  D.W. stated that the police arrived after her brother called 9-1-1.  D.W.'s friend N.C. lived in the house that had been burgled.

D.W. identified Colbert and Tresmon at the revocation hearing.  She stated that she recognized them as the burglars because she had watched them that day for around fifteen minutes and could see them clearly because they had

5

worn nothing over their faces and her view had been unobstructed.[4]

During cross-examination, D.W. agreed that she had identified someone other than Colbert in a photo lineup, and the trial court admitted the photo lineup as Defense Exhibit 4. D.W. agreed that she had identified several individuals as having been the burglars and that she had identified Laron Mosely on the photo lineup. D.W. said that at the time of the robbery, one of the men had a round, bleached or colored ducktail on the back of his head, and she identified that man as Colbert. However, she agreed that she had told police at that time that Herschel Sadler also had a gold ducktail. During her redirect examination, D.W. stated that she had told the police that she had thought the younger of the two burglars was Sadler.[5]

N.C., who was fifteen years old, testified that Colbert's brother A.N.C. was in her grade, called her on August 21, and told her that the YMCA was giving out free Chick-fil-A. When she arrived at the YMCA, there was no free Chick-fil-A. When she returned home, the back door of her house was open, the front door was unlocked, and her family's belongings were missing. She saw a gray van drive away from her house. During cross-examination, N.C. agreed that Sadler had been to her house a few times before.

_____

[4]The trial court overruled Colbert's objection that D.W.'s in-court identification had been tainted with suggestiveness, and Colbert does not complain of this ruling on appeal.

[5]Tresmon testified that he knew Sadler but not Mosely, and he said that Sadler and Mosely were not present at the burglary.

6

N.C.'s mother testified that her two children, ages thirteen and fourteen on August 21, were at home when she went to work that day and that she came home early because of the burglary. She stated that no one had permission to go into her house and take items from the home that belonged to her and that her two big-screen televisions, among other items, were missing. On cross-examination, she said that there had been no damage to the front or back door.

## 2. Defense's Case

Colbert's brother A.N.C. testified that Tresmon lived at his family's house and had access to all of their vehicles. A.N.C. frequently went to N.C.'s house to play games; he said that Colbert and Tresmon dropped him off at N.C.'s house on August 21 using Colbert's silver van. A.N.C. did not know where Colbert and Tresmon had gone after they dropped him off at N.C.'s house.

A.N.C. said that he, N.C., and her brother D.C. went to the YMCA because the YMCA had had Chick-fil-A available that morning. When they arrived at the YMCA around 1:30 p.m., however, while the Chick-fil-A truck was still there, it had run out of food. A.N.C. denied that he had asked N.C. and D.C. to go with him so that someone could burglarize their house or that he had conspired to lure them from their home for that purpose.

A.N.C. testified that he had planned to walk back from the YMCA to N.C.'s house with N.C. and D.C. when his mother called him. They then parted ways because A.N.C. had to go home. A.N.C. said that Colbert and Tresmon picked him up around ten minutes later as he walked home; he did not see any

7

television sets or anything unusual in the van. A.N.C. testified that his house was searched with his mother's consent the day after the burglary and that no evidence of the burglary was found.

Colbert's mother testified that on August 21, 2012, she, her husband, A.N.C., Colbert, another child, and Tresmon lived in the same house. She testified that Tresmon had access to the van and that it was not unusual for him to drive it. On the day of the burglary, after Colbert and Tresmon brought A.N.C. home, Colbert went inside and went to sleep while Tresmon left in the van without telling her where he was going. She described Tresmon as a troubled child and said that while Colbert had never had a gold ducktail hairstyle, Tresmon did.

During recross-examination, the prosecutor asked Colbert's mother with regard to her conversation with the police, "But you also told them you don't think [A.N.C.] could have done nothing [sic], but you told them if [Colbert] was involved, you'd believed [sic] that?" Colbert's mother replied, "I sure did."

## C. Analysis

Colbert argues that the trial court abused its discretion by finding the burglary allegation true because a rational trier of fact could not have believed Tresmon, who identified Colbert to prevent himself from being charged, or D.W., who failed to identify Colbert from the photo lineup.

We disagree. Viewed in the light most favorable to the trial court's revocation decision and deferring to the trial court's resolution of disputed facts

8

and credibility determinations, D.W.'s in-court identification of Colbert supports the burglary finding. *See Gilmore v. State*, 397 S.W.3d 226, 240 (Tex. App.—Fort Worth 2012, pet. ref'd) ("The positive identification of a defendant as the perpetrator is sufficient to support a conviction."); *see also Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (holding that the testimony of one eyewitness alone is sufficient to support a jury verdict); *Douglas v. State*, No. 09-11-00625-CR, 2012 WL 6643848, at *2–3 (Tex. App.—Beaumont Dec. 19, 2012, no pet.) (mem. op., not designated for publication) (concluding that trial court could have believed eyewitness's testimony to support finding that appellant had committed burglary and thereby revoke his community supervision). Further, because the greater weight of the credible evidence would create a reasonable belief that Colbert violated a condition of his community supervision by participating in the burglary,[6] we conclude that the trial court did not abuse its discretion, and we overrule both of Colbert's issues. *See Rickels*, 202 S.W.3d at 763–64.

---

[6]A person is guilty of burglary of a habitation if, without the effective consent of the owner, he enters the habitation intending to commit a theft. *See* Tex. Penal Code Ann. § 30.02(a)(1) (West 2011). Based on the record here, the trial court could have found by a preponderance of the evidence that Colbert intended to break into N.C.'s house to commit theft while N.C. and her brother were at the YMCA with A.N.C. and that Colbert entered the house without permission after dropping A.N.C. off at the house and then removed two televisions.

### III.  Conclusion

Having overruled both of Colbert's issues, we affirm the trial court's judgments.

PER CURIAM

PANEL:  MCCOY, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 27, 2014