

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00144-CR

Anthony Lee **SMITH**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR10000
Honorable Jefferson Moore, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  July 19, 2017

AFFIRMED

After finding Appellant Anthony Lee Smith guilty of Daniel Cantu's murder, the jury

assessed punishment at life imprisonment in the Institutional Division of the Texas Department of

Criminal Justice.  On appeal, Anthony[1] contends the trial court erred in (1) denying the motion to

suppress his custodial statement; (2) admitting evidence for which the State failed to prove a proper

---

[1] Because Appellant Anthony Smith shares the same surname with many of the witnesses, the appellant and many of
the witnesses are referred to by their first names for purposes of this opinion.

chain of custody; and (3) improperly including an instruction on the law of parties. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Investigation Leading to Anthony's Arrest

On the morning of July 28, 2013, San Antonio Police officers responded to a 911 call for a deceased individual near the community mailboxes at the Banyan Tree apartments. With the exception of a single bullet wound, the deceased did not appear to have additional injuries. Attached to the individual's belt was a chain, described as the type commonly attached to a "biker wallet." The officers also found broken chain links located near the body. The wallet was never recovered. Absent other identification, the officers originally identified the deceased, Daniel Cantu, by a "gym tag membership" on Cantu's keyring.

Officers canvassed the area and located two individuals who saw Cantu's body earlier that morning, but mistakenly believed he was "passed out and drunk." Both individuals were excluded as suspects. The medical examiner's autopsy determined Cantu was shot once through his torso, with either a .38 or a .357 handgun.

On August 13, 2013, San Antonio Police Sergeant Ricky Lopez contacted Crime Stoppers' tipster Jean Smith, Anthony's maternal aunt. Jean provided a written statement that, the day after the murder, Anthony confessed to shooting Cantu. Jean's written statement included unreleased, detailed information about the murder, including: the type of firearm used, the proximity of the gunshot wound, and the approximate amount of money stolen from Cantu. Shortly thereafter, officers interviewed Lynell Simmons, another maternal aunt with whom Anthony was living at the time of the murder. Lynell also provided a written statement to officers implicating Anthony in the murder.

The following day, on August 14, 2013, a Bexar County Sheriff's Deputy arrested Anthony for possession of marijuana charges; prior to being booked on the marijuana charges, the deputy transported Anthony to the San Antonio Police Department and released Anthony into the police department's custody. After interviewing Anthony, Sergeant Lopez obtained a warrant and arrested Anthony for Daniel Cantu's murder.

**B.     Testimony before the Trial Court**

An indictment was returned on November 7, 2013, and Anthony's jury trial began on March 7, 2016. The State's case-in-chief, presented over a three-day period, included testimony from eighteen witnesses, several of which the trial court declared adverse to the State.

During Jean's testimony, she acknowledged calling Crime Stoppers and providing a statement to officers, but denied many of the assertions contained in her sworn statement. She contended that the statement included "a lot of stuff in here I probably said but I don't remember saying." Jean testified that when she asked Anthony, "did he do it. He said yes." The following day, Jean called the Crime Stoppers' hotline. During her testimony, Jean acknowledged receiving $5,000.00 for her call, but was adamant that she did not report Anthony for the money or in retaliation for a statement that Anthony provided in an unrelated murder conviction of her son Rafael. Jean denied telling officers the type of weapon used, where Cantu was shot, that Anthony took Cantu's money, or implicating her nephew, Gary Smith, in the murder. "I was doing it because I love my nephew [Anthony] and I'd rather see him in jail than to see him dead on the street." As for her sister, Lynell Simmons, Jean described her as "evil" and "dishonest."

When the State called Lynell as a witness, she also disavowed her written statement; Lynell testified that she could not read or write, in direct contradiction to the officer's testimony who took her statement. Once again, through impeachment, the State elicited testimony that when Lynell questioned Anthony about the murder, Anthony replied, "[H]e wasn't worried about it. 'Auntie,

they don't have a description. They think it was a Mexican that killed a Mexican.'" Also contrary to her written statement, Lynell denied telling officers that Anthony told her that he shot Cantu in the heart, that he robbed him, or that he only "got 100 bucks off of him." Lynell "did not recall" telling officers that she knew Anthony was lying when he told her that Cantu had a knife. She acknowledged making Anthony leave her house, but denied telling Anthony that he could not stay there "because of what he did" or knowing that Anthony owned a .38 handgun. Lynell further acknowledged speaking to the officers out of concern that her son, Gary, would be implicated in the murder. Lynell described her sister Jean as "a liar" and a "money-hungry person."

Anthony's cousin, Tatjana Smith, testified that Anthony was with her, Gary, and a third cousin, Tirion, the evening before the murder. Anthony left the apartment well before Gary and Tirion, both of whom ultimately decided to "go to the club." Tatjana was babysitting Tirion's children when, in the early morning hours, Anthony came back to the apartment. Tatjana testified that she did not let Anthony into the apartment because Tirion was not home.

Darryl King testified that in October of 2013, he was in the Bexar County Jail on a parole violation and housed in the same unit as Anthony. King was also hostile to the State resulting in the trial court declaring King an adverse witness. King described Anthony as "talking" about the murder to different people on many occasions—"that's what they do in jail." More specifically, Anthony said he "killed the white guy" by the mailboxes and that his relatives "snitched" on him. King provided a possible motive when Anthony told him the man "disrespected him at the flea market." Anthony further described that, after shooting Cantu, he ran from the Banyan Tree apartments to the parking lot behind an industrial building with "stoves." Anthony said there was a pipe sticking out of the ground.

The State also called several officers and forensic analysts. Sergeant Lopez presented the clothing Cantu was wearing at the time of his death, specifically his jeans, shirt, belt, and belt

buckle. Sergeant Lopez testified the medical examiner's office removed Cantu's clothing during the autopsy; after completing her examination and marking each object with a unique identification number, the medical examiner released Cantu's clothing to Sergeant Lopez's office for further testing. The packaging, which Sergeant Lopez unsealed in the courtroom, was marked with the unique identification number, initials, and dates on several different locations. Sergeant Lopez testified, and the trial court agreed, the belt buckle and the black shirt, including a small hole, were unique and identifiable in the pictures previously admitted and taken at the crime scene.

During the autopsy, a sample of Cantu's blood was also marked with the same unique identification number. On August 28, 2013, pursuant to a search warrant, Sergeant Lopez collected DNA samples from Anthony. All of Anthony's DNA samples were marked with the unique identifier, initials, and dates. Forensic scientist Jamie Pomykal, with the Bexar County Crime Lab, conducted two different DNA analyses on a sample of material removed from the front hip pocket of Cantu's jeans. Pomykal identified her initials and dates on the packages; she also noted the unique identification number assigned by the Bexar County Medical Examiner's Office. Pomykal testified, "Anthony Smith was not excluded as a contributor to the DNA profile that I obtained on the swab from the pockets." Pomykal was asked to quantify the likelihood of the DNA sample not belonging to Anthony Smith. Pomykal's testimony and report, which was admitted at trial, indicated that she would expect to see the particular sample, in the given populations:

> African American: 1 in 21,610,000,000,000,000,000,000
> Caucasian: 1 in 11,650,000,000,000,000,000,000
> Hispanic: 1 in 28,220,000,000,000,000,000,000

At the conclusion of the testimony, the trial court presented the court's proposed jury charge. Defense counsel objected to the inclusion of the instruction on the law of parties. "[A]ll of their witnesses testified that [Anthony] was the shooter. There [weren't] any witnesses that

testified that [Anthony] had participated in the murder in any way other than that." The trial court overruled the objection explaining that because the testimony included "conflicting evidence" whether Gary Smith was also present at the time of the murder, the instruction on the law of parties was properly included in the court's charge.

The jury subsequently found Appellant Anthony Smith guilty of Daniel Cantu's murder and, following a punishment hearing, assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. This appeal ensued.

## MOTION TO SUPPRESS

### A. Standard of Review

An appellate court reviews a trial court's ruling on a motion to suppress on a bifurcated standard of review; a reviewing court must

> give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo.

*Wilson v. State*, 442 S.W.3d 779, 783 (Tex. App.—Fort Worth 2014, pet. ref'd) (citing *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007)); *see also Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004). This court must "uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case." *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (citing *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). We will reverse the trial court's suppression decision if it is unsupported by the record, "arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

In the present case, Anthony did not request express findings of fact and conclusions of law.

> [W]hen the trial court makes no explicit fact findings and neither party has timely requested findings and conclusions from the trial court[,] . . . the appellate court implies the necessary fact findings that would support the trial court's ruling if the evidence (viewed in the light most favorable to the trial court's ruling) supports these implied fact findings.

*State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006); *see also State v. Cullen*, 195 S.W.3d 696, 698 (Tex. Crim. App. 2006) (holding that, in the context of a motion to suppress ruling, even though the trial court had no obligation to make findings of fact or conclusions of law, nevertheless the trial court must do so when timely requested by the losing party).

## B.     Argument of the Parties

Anthony contends the trial court erred, in denying the motion to suppress, on two grounds: (1) when Anthony was questioned about Cantu's murder, he was not under arrest for the murder; therefore, when the reason for his arrest ended (i.e. the officer decided the marijuana case would be charged at large), Anthony should have been released and his statement suppressed; and (2) Anthony attempted to invoke his right to counsel on three different occasions during the recorded statement.

The State counters Anthony was lawfully in custody, and properly *Mirandized*; Anthony waived his rights and elected to speak to Sergeant Lopez when the statement was taken.

## C.     Custody

Anthony concedes he was lawfully arrested by the Bexar County Sheriff's Office deputy for the possession of marijuana. He argues that because the deputy never intended to book him into jail for the possession charge, his detention and transfer of custody to Sergeant Lopez and the San Antonio Police Department was illegal. We disagree.

In *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004), the Supreme Court explained that, if probable cause was present for the arrest, the officer's subjective intent was irrelevant.

> [The officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.

*Id*. (internal quotations omitted). In the present case, the probable cause supporting the deputy's arrest of Anthony for the possession of marijuana charge is uncontested. Anthony's concession supports that the totality of the circumstances allowed a reasonable officer to conclude that Anthony was engaged in criminal activity. *See Parker v. State*, 206 S.W.3d 593, 599 (Tex. Crim. App. 2006). Whether the deputy decided to arrest Anthony because of the outstanding request by the San Antonio Police Department is irrelevant. *See State v. Rascbaum*, No. PD-1221-05, 2007 WL 1706035, at *2 (Tex. Crim. App. June 13, 2007) (per curiam) (not designated for publication) (explaining that because defendant acknowledged initial traffic stop was valid, he conceded that he committed a traffic offense; because officers were authorized to arrest defendant for the traffic violation, whether officer's subjective intent was to arrest for driving while intoxicated is irrelevant).

We conclude Anthony was properly in custody for the possession of marijuana offense when questioned by Sergeant Lopez and overrule Anthony's arguments contending the interview was the result of an unlawful detention.

**D.    Invocation of Right to Counsel**

Anthony was in custody and not free to leave when he was interviewed by Sergeant Lopez. The interview constituted a custodial interrogation and prior to any questioning by officers, the Fifth Amendment required Anthony to be apprised of specific warnings regarding his right to

- 8 -

consult with an attorney and to have counsel present during custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("[C]ustodial interrogation . . . mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (West Supp. 2014) (requiring warnings only when interrogation is custodial); *see also Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (explaining *Miranda* warnings "safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation").

When a suspect asserts his right to counsel, all interrogation must cease until counsel is provided or until the suspect personally reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Dinkins v. State*, 894 S.W.2d 330, 350 (Tex. Crim. App. 1995). The right to counsel is invoked when a person indicates that he desires to speak to an attorney or to have an attorney present during questioning. *Dinkins*, 894 S.W.2d at 351. "An invocation must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." *Id*.; *see also Davis v. United States*, 512 U.S. 452, 462 (1994) (holding "Maybe I should talk to a lawyer," was not a request for an attorney); *Davis v. State*, 313 S.W.3d 317, 341 (Tex. Crim. App. 2010) (concluding "I should have an attorney," was not a request or an express statement that the suspect wanted an attorney). To sufficiently invoke the right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459; *see also Pecina v. State*, 361 S.W.3d 68, 79 (Tex. Crim. App. 2012).

When reviewing alleged invocations of the right to counsel, we look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine

whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Dinkins*, 894 S.W.2d at 351; *Castillo v. State*, 742 S.W.2d 1, 4 (Tex. Crim. App. 1987). "The test is objective: whether the suspect articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 313 S.W.3d at 339. If a defendant clearly invokes his right to counsel, all interrogation by the police must cease until counsel is provided or until the suspect initiates further conversation. *Davis*, 512 U.S. at 458; *State v. Gobert*, 275 S.W.3d 888, 892–93 (Tex. Crim. App. 2009).

Anthony argues that, on two different occasions during the interview, he clearly invoked his right to counsel and Sergeant Lopez was required to cease any questioning. The record reflects that about half-way through the interview, Anthony told Sergeant Lopez, "I don't got no attorney present." The interview continued.

Towards the end of the interview, Anthony stated, "I'd rather talk to you with my court-appointed." Sergeant Lopez stopped all questions and explained, "because you said that, 'cause you . . . you just told me that, I gotta stop. . . . If you change your mind and you wanna talk about it, I gotta read you your rights again and we gotta start all over. But that'll be up to you." Sergeant Lopez informed Anthony that he was free to use the phone and then left the room.

After some time, Sergeant Lopez returned to the room and Anthony asked where the officers were taking him. Sergeant Lopez explained that he could not talk about the case with Anthony without reading his rights again. Anthony told the officer that he wanted to talk to him. Sergeant Lopez again recited each of the *Miranda* warnings to Anthony. Anthony affirmatively stated that he understood his rights and that he wanted to talk with the officer. Anthony continued to waffle on whether he wanted to discuss Cantu's murder. Sergeant Lopez explained that if Anthony did not want to talk about it, he was going to leave. Anthony replied, "I just don't know

where I'm gonna go if I sit here and talk to you, man." At that point, Sergeant Lopez stopped the interview.

Although Anthony mentioned the word "attorney" and "court appointed," neither of these statements were unambiguous invocations of his right to counsel. Simply mentioning a lawyer, or making comments about a lawyer, does not reach the unambiguous invocation required in *Davis*, 512 U.S. at 458, and its progeny.

Based on a totality of the circumstances surrounding the interview, and considering the evidence in the light most favorable to the fact finder's conclusions, we cannot conclude a reasonable officer would have understood Anthony's statement as a Fifth Amendment invocation of his right to counsel. *See id.*; *Davis*, 313 S.W.3d at 339.

Accordingly, we overrule Anthony's appellate issue regarding any violation of his right to counsel.

### ADMISSION OF EVIDENCE

#### A.    Argument of Parties

In his third issue, Smith contends the State failed to prove a proper chain of custody and the trial court erred in admitting Cantu's clothes and the testimony regarding the DNA tests.

#### B.    Standard of review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Weatherred v. State*, 15 S.W.3d 540, 543 (Tex. Crim. App. 2000); *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1991) (op. on reh'g); *accord Thompson v. State*, 274 S.W.3d 776, 778 (Tex. App.—San Antonio 2008, no pet.). When considering a trial court's decision to admit or exclude

evidence, we will not reverse the ruling unless it falls outside the "zone of reasonable disagreement." *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007); *see also Jessop v. State*, 368 S.W.3d 653, 686 (Tex. App.—Austin 2012, no pet.).

Proof of chain of custody authenticates evidence under rule of evidence 901(a). *See* TEX. R. EVID. 901(a); *Druery v. State*, 225 S.W.3d 491, 503 & n.30 (Tex. Crim. App. 2007). Upon a showing of authenticity, an appellate court affords the trial court great discretion in admitting the evidence at trial. *Druery*, 225 S.W.3d at 503; *accord Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (holding appellate courts apply liberal standard ensuring trial court's determination is within the zone of reasonable disagreement). Generally, the State satisfies chain of custody when evidence establishes where the chain begins and ends, especially if it ends in a laboratory. *Mitchell v. State*, 419 S.W.3d 655, 659 (Tex. App.—San Antonio 2013, pet. ref'd). Evidence of fraud or tampering relating to the gaps in the chain of custody affect the weight given to, not admissibility of, the evidence. *See id.* at 660; *Dominguez v. State*, 441 S.W.3d 652, 660 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997)). "The chain of custody is conclusively proven if the officer is able to identify that he or she seized the item of physical evidence, put an identification mark on it, placed it in the property room, and then retrieved the item being offered on the day of trial." *Hartsfield v. State*, 200 S.W.3d 813, 818 (Tex. App.—Texarkana 2006, pet. ref'd).

"Any gaps in the chain of custody go to the weight of the evidence, not admissibility; however, proof should be shown as to the beginning and end of the chain." *Id.* It is within the jury's purview "to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is

authentic." *Butler*, 459 S.W.3d at 600 (citing *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

## C.   Analysis

We note Anthony's complaint is based on alleged gaps in the chain of custody; he does not assert any alleged tampering of the evidence. Anthony also concedes Cantu's shirt was distinct, but contends the jeans and belt were not.

Sergeant Lopez and the medical examiner identified the jeans, belt, belt buckle, and shirt as belonging to Cantu. The medical examiner testified that Cantu arrived at the morgue fully clothed. She removed the clothes and marked them with a unique identification number.

Similarly, Sergeant Lopez collected Anthony's DNA pursuant to a valid search warrant. The buccal swabs were marked with the unique identification number, initials, and date. Like the portion of the jean pocket from which the DNA was obtained, the forensic scientist testified that she verified all of the tested samples were marked with the same unique identifier. The DNA testing occurred on two different occasions; on each occasion, the forensic scientist verified the unique markings prior to testing. After completing the tests, the forensic scientist resealed the package, and proceeded to mark the packaging with her initials and the date.

At trial, Sergeant Lopez confirmed the numbers on the outside of the packaging matched the unique identification number. Although the blood sample packages remained sealed, Sergeant Lopez opened the exhibits containing the clothing in the courtroom and visually confirmed the contents. The State offered the packaging, including the unique markings. The trial court found the clothing, specifically the belt buckle, possessed fairly unique and readily identifiable characteristics. On the record, the trial court compared the belt buckle in evidence with the belt buckle depicted in the crime scene photographs. The State presented evidence of the beginning, the middle, and the end of the chain. *See Mitchell*, 419 S.W.3d at 659–60. We cannot conclude

the trial court's findings were arbitrary or unreasonable. *See Montgomery*, 810 S.W.2d at 380; *Thompson*, 274 S.W.3d at 778. Thus, the trial court did not abuse its discretion in denying the motion to suppress based on Anthony's chain of custody complaints. *See Rodriguez*, 203 S.W.3d at 841.

We overrule Anthony's chain of custody issues on appeal.

## JURY INSTRUCTION

### A. Argument of Parties

Smith argues that because there is no evidence as to Gary's involvement in the shooting, the trial court erred by charging the jury under the law of parties.

### B. Standard of Review

Appellate courts review potential jury charge errors in a two-step process. *See Hines v. State*, 383 S.W.3d 615, 626 (Tex. App.—San Antonio 2012, pet. ref'd) (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)). The appellate court must first determine whether the charge is erroneous. *Kirsch*, 357 S.W.3d at 649. If error exists, the court analyzes the level of harm incurred by the defendant; the level of harm is contingent on whether the error was preserved. *Id.*

Here, because error was preserved, Anthony need only show he suffered "some harm" to prevail on appeal. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988); *see also Rivas v. State*, 486 S.W.3d 640, 649–50 (Tex. App.—San Antonio 2016, pet. ref'd). For harm to result, however, the record must show "'actual, rather than merely theoretical, harm.'" *Segovia v. State*, 467 S.W.3d 545, 556 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Reeves*, 420 S.W.3d at 816). "Neither the State nor the defendant has a burden to prove harm." *Reeves*,

420 S.W.3d at 816. To determine "some harm," the appellate court evaluates "(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Id.* (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013)); *see also Segovia*, 467 S.W.3d at 556.

**C.      Analysis**

Assuming, without deciding, that the inclusion of the instruction on the law of parties was erroneous, we find the error, if any, was harmless. *See Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999); *see also Gilmore v. State*, 397 S.W.3d 226, 244 (Tex. App.—Fort Worth 2012, pet. ref'd). In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties. *See* TEX. PENAL CODE ANN. § 7.01 (West 2011) (providing a person may be charged in an offense committed by his conduct, if he acted as a principal, or that of someone else, if the party acted as an accomplice); *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999); *accord Gilmore*, 397 S.W.3d at 244. However, "[e]ven where proper objection is made at trial, . . . [if] the evidence clearly supports a defendant's guilt as the primary actor, error in charging on the law of parties [is] harmless." *Cathey*, 992 S.W.2d at 466; *accord Ladd*, 3 S.W.3d at 564–65.

Neither defense counsel nor the State concentrated on Gary as the shooter; Gary was simply offered to create reasonable doubt as to Anthony being the shooter. Several witnesses testified that Anthony confessed to the shooting and provided details only someone present during the offense would know. Additionally, the DNA evidence strongly supports Anthony's presence at the crime scene.

Anthony contends, and we agree, there was no evidence tending to show his guilt as a party. We, thus, conclude the jury likely did not rely on the law of parties' instruction in arriving at its verdict. The record does not support the trial court's decision to include the instruction on

the law of parties was calculated to injure Anthony's rights or that Anthony suffered even "some harm" as a result of the instruction. *See Reeves*, 420 S.W.3d at 816; *Almanza*, 686 S.W.2d at 171.

Accordingly, we overrule Anthony's final issue on appeal.

### CONCLUSION

Having overruled each of Appellant Anthony Smith's issues on appeal, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

DO NOT PUBLISH